IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

EDWARD HENDERSON                                                                        PLAINTIFF

v.                              NO. 5:16-cv-00125 PSH

NANCY A. BERRYHILL, Acting Commissioner                                  DEFENDANT
of the Social Security Administration

## MEMORANDUM OPINION AND ORDER

Plaintiff Edward Henderson ("Henderson") began this case by filing a complaint pursuant to 42 U.S.C. 405(g). In the complaint, he challenged the final decision of the Acting Commissioner of the Social Security Administration ("Commissioner"), a decision based upon findings made by an Administrative Law Judge ("ALJ").

Henderson maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole and offers several reasons why, one of which has merit.[1] It is Henderson's position that the ALJ improperly discounted the opinions of Simmie Armstrong, Jr., M.D., ("Armstrong"), Henderson's treating physician. With regard to Armstrong's opinions contained in an October of 2013 medical source statement, the Court finds that the ALJ failed to give sound reasons for discounting the opinions.

---

[1] The question for the Court is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." See Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011).

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of "the most a person can do despite that person's limitations." See Brown v. Barnhart, 390 F.3d 535, 538-39 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record, but the assessment must be supported by some medical evidence. See Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010). In making the assessment, the ALJ is required to consider the medical opinions in the record. See Wagner v. Astrue, 499 F.3d 842 (8th Cir. 2007). A treating physician's medical opinions are given controlling weight if they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence. See Choate v. Barnhart, 457 F.3d 865 (8th Cir. 2006). The ALJ may discount or even disregard a treating physician's medical opinions if other medical assessments are supported by better or more thorough medical evidence or where the treating physician renders inconsistent opinions that undermine the credibility of his opinions. See Id.

The bulk of the medical evidence in this case is comprised of Armstrong's progress notes from his numerous examinations of Henderson over the course of several years.[2] In January of 2011, Armstrong signed a "To Whom It May Concern" letter in which he offered his opinions about Henderson's impairments and the impact they have on his ability to work. Armstrong opined the following:

---

[2] Armstrong represented in his October of 2013 medical source statement that he began seeing Henderson sometime in 2000. See Transcript at 556. The Court has no reason to doubt Armstrong's representation as to when he began seeing Henderson, although Armstrong's earliest progress note in the record appears to be from October of 2009. See Transcript at 399.

> I have been Mr. Henderson's treating physician for several years. He has been treated for shortness of breath, anxiety, bronchospams, cellulitis to the left knee, acute lumbar strain, atypical chest pain, chest wall pain, costochondritis, meralgia paresthetica, left, nocturia, narcolepsy, URI, right shoulder strain, blurred vision on left side, tingling sensation of the legs, syncopal episodes, diabetes, seizure activity, atypical, ocular migraines, auras, dizziness, type 2 diabetes mellitus, obesity, panic attacks, bursitis of right shoulder, arthralgia of the right shoulder, hyperactivity, TMJ, abnormal growth of the gums, fainting episodes, vertigo, lightheaded and wooziness, and early glaucoma.
>
> Mr. Henderson is grossly obese. His weight is consistently over 300 pounds. It has been as high as 326 pounds.
>
> On July 14, 2006, I told Mr. Henderson that "eventually he should not be driving." I have told him since then to stop driving.
>
> I ordered an [MRI] for his seizure like activity. Due to his obesity, he would not fit into the machine at the hospital.
>
> Mr. Henderson has always been a good, hard-working, cooperative patient and he has followed my medical advice.
>
> Mr. Henderson is limited in his ability to walk, stand, kneel, climb, push, and several other movements, because of his multiple medical problems and his gross obesity.
>
> Mr. Henderson's gross obesity, which has become worse since he has not worked since February of 2009 limits his ability to bend, stand, stoop, squat, and all other physical type movements.
>
> As his treating physician since 2000, it is my opinion, based upon reasonable medical certainty, that a combination of all of Mr. Henderson's medical problems, his gross obesity, his inability to drive, and his inability to control his movements from time to time because of the seizure like activity and fainting spells, he is totally disabled and his is not able to perform his past relevant work, any jobs, sedentary or otherwise that exist in the local, regional, and national economy.

See Transcript at 275.

On the heels of the "To Whom It May Concern" letter, Armstrong saw Henderson on what appears to have been thirteen occasions between January of 2011 and February of 2012. See Transcript at 393 (01/07/2011), 390 (03/02/2011), 389 (03/11/2011), 388 (06/15/2011), 385 (07/01/2011), 384 (07/29/2011), 383 (08/19/2011), 382 (10/01/2011), 381 (10/18/2011), 380 (12/19/2011), 379 (01/02/2012), 378 (01/30/3012), 377 (02/27/2012). The progress notes from the examinations reflect that Henderson primarily complained of, and sought treatment for, significant sleep-related problems and significant problems caused by or otherwise related to his excessive weight. He was consistently diagnosed with, inter alia, sleep disorders identified at different times as insomnia, sleep apnea, hypersomnolence, and narcolepsy. He was also consistently diagnosed as being obese.

In March of 2012, Henderson presented to the Jefferson Regional Medical Center complaining of shortness of breath. See Transcript at 281-306.[3] He was placed on "100% rebreather" and eventually moved into the intensive care unit. See Transcript at 290. He appears to have been hospitalized for two days and then released. A discharge summary was prepared, and Clyde Campbell, M.D., ("Campbell") observed in the summary that Henderson's impairments included the following: "type 2 respiratory failure/CO2 narcosis, probably acute on chronic respiratory failure," "obstructive sleep apnea-obese," "hypoventilation syndrome," and "morbid obesity." See Transcript at 304.

---

[3] Henderson also complained of pain in his legs and feet. The pain was attributed to peripheral neuropathy.

In June of 2012, Campbell signed a "To Whom It May Concern" letter in which he offered his opinions about Henderson's impairments and the impact they have on his ability to work. Campbell opined the following:

> This is in regard to the disability status of Mr. Henderson. I saw this man during a recent hospitalization at [Jefferson Regional Medical Center] where I learned that he had been turned down for social security disability in the past.
>
> This man has chronic respiratory failure and will be on continuous oxygen for the foreseeable future. He clearly has obstructive sleep apnea but has not been able to afford the appropriate testing much less CPAP therapy which is the appropriate treatment. Because of his sleep apnea, he is not able to stay awake because of severe hypersomnolence and therefore is not able to drive.
>
> Because of these multiple problems, it seems very clear to me that this patient is permanently and totally disabled. …

See Transcript at 400.

Armstrong continued to see Henderson and did so on what appears to have been thirteen occasions between April of 2012 and August of 2013. See Transcript at 375-376 (04/18/2012), 374 (05/14/2012), 373 (06/20/2012), 471 (09/18/2012), 470 (10/16/2012), 469 (12/04/2012), 468 (12/17/2012), 467 (01/16/2013), 492 (01/30/2013), 491 (02/20/2013), 514 (04/08/2013), 554 (08/12/2013), 553 (08/19/2013). The progress notes from the examinations reflect that Henderson continued to complain of, and seek treatment for, his sleep-related disorders and the problems associated with his excessive weight. He also began to complain of back and hip pain.

In January of 2013, William Payne, M.D., ("Payne") saw Henderson for a consultative examination. See Transcript at 473-478.[4] Payne performed testing of Henderson's pulmonary functioning and found no evidence of an "obstructive lung defect." See Transcript at 474. Payne observed, though, that more detailed testing of Henderson's pulmonary function "may be useful if clinically indicated." See Transcript at 474.

In August of 2013, Henderson was seen at Jefferson Regional Medical Center for testing of his back and left hip. See Transcript at 560-563. The results of the imaging of his left hip were largely normal, but the results of the imaging of his back were interpreted to be as follows: "[s]evere degenerative disc changes at L5-S1" and "[d]egenerative facet joint changes at L5-S1 with mild retrolisthesis of L5 on S1." See Transcript at 563.

In October of 2013, Armstrong completed a medical source statement in which he again offered his opinions about Henderson's impairments and the impact they have on his ability to work. See Transcript at 556-559. Armstrong identified Henderson's impairments as lumbar disc disease and sleep apnea. Armstrong opined, inter alia, that Henderson's impairments prevent him from sitting and/or standing for more than fifteen minutes at one time and for a total of less than two hours in an eight hour workday, and the impairments prevent him from rarely lifting and carrying more than ten pounds.

---

[4] The bulk of Payne's report consists of graphs, diagrams, and numbers that mean nothing to the untrained eye.

Henderson filed an application for disability insurance benefits and represented that he became disabled and unable to work on October 19, 2010. See Transcript at 175. He also completed a series of documents in connection with his application. See Transcript at 222-229, 238-239, 240, 244-250. In the documents, he represented that he cannot sleep when he should and, in turn, sleeps when he should not. He can attend to his personal care, can prepare simple meals, and can perform some house and yard work. He does not drive on the advice of his physician. His physical impairments make it difficult for him to stand, walk, sit, lift, climb, kneel, and squat. He can only walk about fifty feet before he must stop and rest.

The record contains a summary of Henderson's FICA earnings. See Transcript at 185. The summary reflects that he has a decent work history. It is noteworthy, though, that he had earnings of $13,275.00 in 2011 and earnings of $14,666.00 in 2012.

Henderson testified during the administrative hearing. See Transcript at 98-112. He was fifty-three years old at the time. He occasionally drives, although there was an eighteen month period of time when he did not because of his tendency to fall asleep. His sleep apnea and back pain prevent him from working. He uses a Bilevel Positive Airway Pressure machine which reduces carbon dioxide buildup in his lungs. He checks his oxygen level constantly, and he feels light-headed when it gets too low. Before he sought treatment for his sleep disorders, he was known to have fallen asleep while standing. He is seventy-five inches tall and weighs 313 pounds, although he has weighed as much as 350 pounds.

The ALJ found at step one of the sequential evaluation process that Henderson engaged in substantial gainful activity for the period from October 19, 2010, through December 31, 2012. The ALJ found that although Henderson earned $4,900.00 in 2013, the earnings did not rise to the level of substantial gainful activity. At step two, the ALJ found that Henderson has severe impairments in the form of "hip pain, degenerative disc disease, history of sleep apnea, anxiety, and eye pain." See Transcript at 82. The ALJ assessed Henderson's residual functional capacity and found that he can perform light work, albeit with the following limitations:

> … he can occasionally stoop, crouch, crawl, and kneel. He can have no work with respiratory irritants. Further, interpersonal contact is limited to routine and superficial. The complexity of tasks should be learned by experience with several variables and judgment is within limits. He should have little supervision for routine tasks and detailed supervision for non-routine tasks.

See Transcript at 83. In making the assessment, the ALJ gave little to no weight to Armstrong's opinions contained in his January of 2011 "To Whom It May Concern" letter. The ALJ did so because Henderson was working in 2011 and 2012, and Armstrong's opinions were therefore incorrect. The ALJ also gave little weight to Armstrong's opinions contained in his October of 2013 medical source statement. The ALJ did so because of Armstrong's "inability to judge [Henderson's] ability." See Transcript at 86. The ALJ found at step four that Henderson is unable to perform his past work but found at step five that there are other jobs he can perform and is therefore not disabled.

The Court is troubled by the fact that not one but two physicians, one of whom was Henderson's treating physician, opined that Henderson has impairments that give rise to significant work-related limitations. Armstrong and Campbell agreed that Henderson's sleep disorders cause significant work-related limitations, and Armstrong additionally noted that Henderson's lumbar disc disease causes significant work-related limitations. It is difficult to see how Armstrong and Campbell could have reached similar conclusions about Henderson's ability to perform work-related activites unless he has significant limitations. The role of the ALJ, though, is not to count the number of medical opinions and decide the case on the basis of the number of opinions supporting a particular proposition; instead, the ALJ must evaluate the evidence and decide the case on the basis of all the evidence in the record.

The ALJ's decision to accord little to no weight to Armstrong's opinions contained in his January of 2011 "To Whom It May Concern" letter is supported by substantial evidence on the record as a whole. Henderson engaged in substantial gainful activity in 2011 and 2012, or for two years after Armstrong opined that Henderson was disabled. Armstrong's opinions also encroach upon a matter reserved exclusively for the ALJ. See Ellis v. Barnhart, 392 F.3d 988 (8th Cir. 2005) (opinion that claimant "disabled" or "unable to work" is matter reserved for ALJ and is not type of opinion given controlling weight). The ALJ's decision to accord little weight to Armstrong's opinions contained in his October of 2013 medical source statement, though, is not supported by substantial evidence on the record as a whole. The Court so finds for the following reason.

A treating physician's medical opinions are given controlling weight if they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence. The record reflects that Armstrong saw Henderson twenty-six times between January of 2011 and August of 2013 and therefore had an ample opportunity to fully assess Henderson's physical limitations. It is not clear how much testing Armstrong performed prior to offering his opinions in the October of 2013 medical source statement, but a lack of testing or inconsistent test results was not given as a reason for discounting Armstrong's opinions. It is not clear how Armstrong's opinions in the October of 2013 medical source statement were inconsistent with the other substantial evidence, but a lack of consistency with the other substantial evidence was not given as a reason for discounting Armstrong's opinions.

The ALJ may discount or even disregard a treating physician's medical opinions if other medical assessments are supported by better or more thorough medical evidence or where the treating physician renders inconsistent opinions that undermine the credibility of his opinions. In this instance, the lion's share of the medical evidence is comprised of Armstrong's progress notes and his October of 2013 medical source statement. There are few other medical assessments to consider, and one of them, one offered by Campbell, is consistent with Armstrong's opinions. This case is also not an instance in which a treating physician has rendered inconsistent opinions. If nothing else, Armstrong's opinions have been consistent; he has consistently opined that Henderson has significant limitations impairing his ability to perform work-related activities.

-10-

The reason the ALJ gave for discounting Armstrong's opinions contained in the October of 2013 medical source statement was that Armstrong was unable to judge Henderson's work-related abilities, apparently because Armstrong's earlier opinions were suspect. Although the ALJ's reason is certainly one factor to consider, there are undoubtedly other factors that should be considered. It is not impossible that a physician could offer suspect opinions at one point, then sometime later offer opinions that should be credited.

The Commissioner maintains that the ALJ discounted Armstrong's opinions contained in the October of 2013 medical source statement not only because Armstrong was unable to judge Henderson's work-related ability but also because the opinions were inconsistent with the "longitudinal record of treatment." See Document 16 at 10. A fair reading of the ALJ's decision, though, does not support the Commissioner's position. Although Armstrong's progress notes contain some unremarkable findings, e.g., "[Henderson] is getting along pretty good and looks pretty good," see Transcript at 373, the ALJ did not give those findings as a reason for discounting Armstrong's opinions.

The ALJ's decision to accord little weight to Armstrong's opinions contained in his October of 2013 medical source statement is not something the Court takes lightly. A treating physician is "usually more familiar with a claimant's medical condition than are other physicians ..." See Thomas v. Sullivan, 928 F.2d 255, 259 n.3 (8th Cir. 1991) [internal quotation omitted]. If the opinions should be discounted or disregarded, sound reasons should be offered. In this instance, those reasons are not readily apparent.

It is for the foregoing reason that substantial evidence on the record as a whole does not support the ALJ's treatment of Armstrong's opinions contained in the October of 2013 medical source statement. A remand is therefore necessary. Upon remand, the ALJ shall re-assess Henderson's residual functional capacity and, as a part of doing so, re-evaluate Armstrong's opinions. If Armstrong's opinions should be discounted or disregarded, the ALJ shall offer sound reasons for doings so.[5]

The Commissioner's decision is reversed, and this case is remanded. The remand in this case is a "sentence four" remand as that phrase is defined in 42 U.S.C. 405(g) and <u>Melkonyan v. Sullivan</u>, 501 U.S. 89 (1991). Judgment will be entered for Henderson.

IT IS SO ORDERED this 15th day of March, 2017.

_____
UNITED STATES MAGISTRATE JUDGE

---

[5] Henderson also alleges that no consideration was given to the impact his obesity has on his other impairments. Upon remand, the ALJ should more fully consider Henderson's obesity.